# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| AGRI-AFC, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> **RONALD JOE EVERIDGE, III; RABBIT RIDGE FARMS, INC.; RONALD J. EVERIDGE, JR.; DADDY RABBIT FARMS, INC.; and JEANNA D. EVERIDGE,** <br><br> *Defendants.* | **CIVIL ACTION NO.** <br> **5:16-cv-00224-TES** |

## ORDER GRANTING IN PART AND DENYING IN PART
## CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

The following facts are undisputed. In 2015, Defendants Ronald Everidge, Jr. ("Ron"), Jeanna Everidge ("Jeanna"), and their son Ronald Everidge, III ("Tripp," now deceased)[1] farmed several tracts of land through their businesses, Defendants Daddy

---

[1] According to Jeanna's affidavit, Tripp died in a crop-dusting accident during the pendency of this action. *See* [Doc. 127-3, ¶ 18]. Tripp's former attorney, Wesley Boyer, notified the Court and Plaintiff's counsel of Tripp's death via a Suggestion of Death filed on July 25, 2017. [Doc. 32]. The Suggestion of Death simply states, "COMES NOW the attorney for Defendant Ronald Joe Everidge, III and suggests upon the record the death of Ronald Joe Everidge, III during the pendency of this case." [*Id.* at p. 1]. Shortly thereafter, the Court held a telephone conference to discuss substituting a party for Tripp. [Doc. 36]. Plaintiff's counsel, Deena Plaire-Haas, confirmed that she had not filed a motion to substitute because she believed Mr. Boyer's suggestion of death to be inadequate under Federal Rule of Civil Procedure 25. The Court instructed Mr. Boyer to determine whether the Suggestion of Death complied with federal law and to refile it if necessary. After the telephone conference, Plaintiff filed an Amended Complaint [Doc. 46], and Defendants filed Amended Answers [Docs. 51, 52], all of which list Tripp as a party instead of his representative or an administrator of his estate. As of the date of this Order, neither party has filed a motion to substitute or a motion to dismiss under Rule 25(a)(1). Therefore, the Court considers the claims against Tripp as pled.

Rabbit Farms, Inc. ("Daddy Rabbit") and Rabbit Ridge Farms, Inc. ("Rabbit Ridge"), collectively referred to as the "Everidge Entities" or "Entities." Ron and Jeanna are husband and wife, and Tripp was their son. Ron is the sole shareholder and president of Rabbit Ridge, Jeanna is the sole shareholder and president of Daddy Rabbit, and Tripp assisted his father in farming for Rabbit Ridge. Essentially, Plaintiff Agri-AFC, LLC alleges that Defendants executed four promissory notes in 2015, paid for farming products with proceeds from the promissory notes, used those farming products, and then defaulted on the notes after they became due in 2016.[2]

### A.    The "Tripp Note"

On May 6, 2015, Tripp allegedly executed an "Input Finance Agreement containing Loan Agreement, Promissory Note, and Security Agreement" by which he borrowed $150,000.00 from The Cooperative Finance Association, Inc. ("CFA") in order to cover expenses incurred in dealing with Plaintiff, a seller of farming products. [Doc. 46-6, p. 1, Section A(2)]. On June 2, 2015, Tripp and CFA allegedly modified the Input Finance Agreement to increase the line of credit to $250,000.00. [*Id.* at p. 7]. The loan came due on February 15, 2016. [*Id.* at p. 4]. On April 12, 2016, CFA sent a letter to Tripp informing him that he was in default on the loan and owed the principal amount of the

---

[2] Plaintiff's predecessor, Cooperative Finance Association, initially brought three separate lawsuits in this Court: one against Tripp (5:16-cv-00224-TES); one against Ron and Rabbit Ridge (5:16-cv-00226-CAR); and one against Jeanna and Daddy Rabbit (5:16-cv-00227-CAR). On September 22, 2017, the Court substituted Agri-AFC as the plaintiff in each of those cases. ECF Nos. 40, 35, 35, respectively. The Court consolidated the cases into this one on October 20, 2017. *Agri-AFC, LLC v. Daddy Rabbit Farms, Inc.*, No. 5:16-cv-00227-CAR, ECF No. 38.

loan ($250,000.00) in addition to $11,559.22 in interest accrued as of the date of the letter. [Doc. 46-13, p. 1]. When Tripp failed to pay the amount due, CFA sent him a second letter on May 2, 2016, reminding him that the he was in default on the loan and updating the accrued interest amount to $13,121.71. [*Id.* at p. 3]. A month later, CFA filed the instant action against Tripp for breach of contract, seeking to recover the principal amount of the loan, accrued interest, and attorney's fees and costs. [Doc. 1].

CFA assigned the Note to Agri-AFC on August 1, 2017, [Doc. 46-7], and the Court substituted Agri-AFC for CFA as the plaintiff in this action [Doc. 40]. Plaintiff amended its Complaint and now seeks recovery relating to the Tripp Note under two theories. First, Plaintiff asserts a breach of contract claim based solely on the terms of the Tripp Note as modified. [Doc. 46, Count XI]. Plaintiff alleges that either Tripp or Ron could be liable for this breach of contract claim because, if Tripp did not sign the Note himself, Ron signed it and is liable as Tripp's agent. [*Id.* at Count XIV]. Alternatively, Plaintiff alleges that, if Tripp did not sign the Note himself, he is still liable for the amount owed under the Note because Ron signed it with Tripp's apparent authority. [*Id.* at Count XV]. Under the second alternative, Plaintiff alleges that, if Tripp did not sign the Note himself and if Ron did not sign the Note at all or do so with Tripp's apparent authority, Tripp is still liable for the amount owed under the Note because he ratified any unauthorized signature by accepting goods paid for with proceeds from the Note. [*Id.* at Count XVI].

Plaintiff also alleges that, if Tripp is not liable under the terms of the Note, he is liable on a theory of open account because he accepted goods paid for with proceeds from the Note but did not pay CFA back for the advanced funds. [*Id.* at Count XII]. But Plaintiff alternatively alleges that, if the facts show that Tripp did not accept the goods paid for with funds advanced from the Tripp Note, Daddy Rabbit and/or Rabbit Ridge are liable because they accepted those goods and used them. [*Id.* at Counts X, XVII].

Under both theories (breach of contract and unjust enrichment/open account), Plaintiff also argues that it is entitled to attorney's fees and expenses. [*Id.* at Count XIII].

### B. The "Daddy Rabbit Note"

On May 18, 2015, Jeanna purportedly executed an "Input Finance Agreement containing Loan Agreement, Promissory Note, and Security Agreement" in her individual capacity and as president of Daddy Rabbit. [Doc. 46-2]. Under the terms of the agreement, Jeanna and Daddy Rabbit jointly borrowed $250,000.00 from CFA in order to cover expenses incurred in dealing with Plaintiff. As with the Tripp Note, this Daddy Rabbit Note matured on February 15, 2016. [*Id.* at p. 4]. On April 12, 2016, CFA notified Jeanna and Daddy Rabbit that they were in default on the Daddy Rabbit Note and owed $250,000.00 in principal and $13,665.30 in interest as of the date of the letter. [Doc. 46-11, p. 1]. On May 2, 2016, CFA sent Jeanna and Daddy Rabbit a second letter regarding their default and updating the accrued interest amount to $15,227.81. [*Id.* at p. 3].

CFA assigned the Daddy Rabbit Note to Plaintiff on August 1, 2017, [Doc. 46-3], and Plaintiff filed suit against Jeanna and Daddy Rabbit approximately three months later [Doc. 46]. Plaintiff seeks to recover under two theories. First, Plaintiff asserts a breach of contract claim based solely on the terms of the Note. [Doc. 46, Count I]. Plaintiff alleges that, under this breach of contract theory of recovery, Jeanna and Daddy Rabbit are jointly liable for the total principal and accrued interest on the Note, plus attorney's fees and costs under Georgia law. [*Id.* at Counts I, III]. However, Plaintiff alleges that, if Jeanna did not sign the Note herself, Ron signed it and is liable as Jeanna and Daddy Rabbit's agent. [*Id.* at Count IV]. Alternatively, Plaintiff alleges that, even if Jeanna did not sign the Note herself, she and Daddy Rabbit are still liable for the amount owed under the Note because Ron signed it with their apparent authority. [*Id.* at Count V]. In the second alternative, Plaintiff alleges that, if Jeanna did not sign the Note herself and if Ron did not sign the Note at all or did not do so with Jeanna and Daddy Rabbit's apparent authority, Jeanna and Daddy Rabbit are still liable for the amount owed under the Note because they ratified any unauthorized signature by accepting goods paid for with proceeds from the Note. [*Id.* at Count VI].

Plaintiff also alleges that, if Jeanna and Daddy Rabbit are not liable under the terms of the Note, they are liable for unjust enrichment or on a theory of open account because they accepted goods paid for with proceeds from the Note but did not pay CFA back for

the advanced funds. [*Id.* at Count II]. Plaintiff also seeks attorney's fees and expenses under this theory. [*Id.* at Count III].

### C.   The "Rabbit Ridge Note"

On the same day Jeanna allegedly executed the Daddy Rabbit Note, Ron executed an identical $250,000.00 note (hereinafter the "Rabbit Ridge Note") in his individual capacity and as president of Rabbit Ridge Farms. [Doc. 46-4]. The relevant terms were the same as those in the Daddy Rabbit Note and the Tripp Note. CFA sent two letters to Rabbit Ridge and Ron on April 12 and May 2, 2016, informing them that they had defaulted on the Note. [Doc. 46-12]. CFA also assigned the Rabbit Ridge Note to Plaintiff on August 1, 2017. [Doc. 46-5].

Plaintiff filed suit against Ron and Rabbit Ridge on October 27, 2017, seeking to recover under the terms of the Rabbit Ridge Note and under a theory of unjust enrichment/open account. [Doc. 46]. First, Plaintiff alleges that Ron and Rabbit Ridge are liable for breaching the loan agreement by failing to pay the amount due under the terms of the Note. [*Id.* at Count VII]. Second, Plaintiff alleges that, if Ron and Rabbit Ridge are not liable under the terms of the Note, they are liable for unjust enrichment or on a theory of open account because they accepted goods paid for with proceeds from the Note but did not pay CFA back for the advanced funds. [*Id.* at Count VIII]. But Plaintiff alternatively alleges that, if the facts show that Ron and/or Rabbit Ridge did not accept

the goods paid for with funds advanced from the Rabbit Ridge Note, Daddy Rabbit is liable because it accepted those goods and used them. [*Id.* at Count X].

D.    **The "Jeanna Note"**

Finally, on August 21, 2015, Jeanna purportedly executed a second loan agreement, this time with Producers Credit Corporation, in her individual capacity and as president of Daddy Rabbit. [Doc. 46-14]. Under the terms of the agreement, Jeanna and Daddy Rabbit borrowed $250,144.00 and posted their crops (present and future), farming equipment, and crop inputs (i.e. seeds, fertilizer, chemicals, and other products used in the growing and harvesting of crops), among other instruments and future payments, as collateral. [*Id.* at pp. 1, 5]. The loan matured on February 1, 2016. [*Id.* at p. 1]. At some point prior to May 13, 2016, Producers Credit Corporation assigned this "Jeanna Note" to Plaintiff, who informed Jeanna and Daddy Rabbit on that date that they were in default on the loan. [Doc. 46-16].

Plaintiff is suing Jeanna and Daddy Rabbit in relation to the "Jeanna Note" under a breach of contract theory and an open account theory. [Doc. 46]. First, Plaintiff alleges that Jeanna and Daddy Rabbit are liable for principal and accrued interest under the terms of the Note. [*Id.* at Count XVIII]. However, if Jeanna did not sign the Note, Plaintiff alleges that Ron is liable as Jeanna and Daddy Rabbit's agent for signing the Note. [*Id.* at Count XX]. In the second alternative, Plaintiff alleges that if Ron signed the Note on Jeanna and Daddy Rabbit's behalf, Jeanna and Daddy Rabbit are liable because Ron

signed the Note with their apparent authority. [*Id.* at Count XXI]. In the third alternative, Plaintiff argues that Jeanna and Daddy Rabbit are liable for breach of contract because, even if the Note was not signed by Jeanna or by someone with apparent authority, Jeanna and Daddy Rabbit ratified the agreement by accepting goods paid for with funds from the Note. [*Id.* at Count XXII].

Plaintiff further alleges that, if Jeanna, Daddy Rabbit, and/or Ron are not liable under a breach of contract theory, Jeanna and Daddy Rabbit are liable under a theory of open account for accepting goods paid for with funds from the Jeanna Note. [*Id.* at Count XIX].

### E. The Parties' Motions for Partial Summary Judgment

Plaintiff moves for summary judgment on two of the three open account claims against Jeanna and Daddy Rabbit [Doc. 46, Counts II, X]; on the open account claim against Tripp [*id.* at Count XII]; and on one of the two open account claims against Rabbit Ridge [*id.* at Count XVII]. Plaintiff also moves for summary judgment on the breach of contract and attorney's fees claims against Ron and Rabbit Ridge [*id.* at Counts VII, IX].

In response, Jeanna and Daddy Rabbit cross-move for summary judgment on all of the open account claims against them [*id.* at Counts II, X, XIX].[3] Jeanna and Daddy

---

[3] In Count VIII, Plaintiff alleges that Ron and Rabbit Ridge are liable on open account for the Rabbit Ridge Note. This is the only open account claim that has not been raised in either motion for partial summary judgment.

Rabbit also seek summary judgment on the breach of contract claims [*id.* at Counts I, V, VI, XVIII, XXI, XXII] and the claim for attorney's fees against them [*id.* at Count III].[4]

For the following reasons, the parties' Partial Motions for Partial Summary Judgment [Docs. 69, 77] are both **GRANTED IN PART**. Additionally, Jeanna and Daddy Rabbit's Motion to Strike the Testimony of Dianne Peterson [Doc. 78] is **GRANTED**.

## DISCUSSION

### A.    Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[5] As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th

---

[4] Jeanna and Daddy Rabbit request that the Court strike Plaintiff's response to their motion for partial summary judgment as untimely filed. *See* [Doc. 93, pp. 1–2]. Plaintiff filed two responses to Plaintiff's motion, *see* [Docs. 86, 92], the second of which was filed on the same day as Jeanna and Daddy Rabbit's reply brief. The response briefs appear to be identical, except that the second one was filed in text-searchable PDF, as required by the Court. Accordingly, the Court denies Jeanna and Daddy Rabbit's request to strike Plaintiff's response brief as moot.

[5] The parties repeatedly cite and rely on the Georgia summary judgment statute (Ga. Code Ann. § 9-11-56) and law applying that statute in their briefs. Given that this case is before the Court under diversity jurisdiction, the Federal Rules of Civil Procedure and the case law applying those Rules govern. *See Hanna v. Plumer*, 380 U.S. 460, 469–74 (1965).

Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See American Banks Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal

quotation marks and citations omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See American Bankers*, 408 F.3d at 1331. However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted).

## B.    <u>Plaintiff's Open Account Claims</u>

In Georgia, an action on open account is a simplified method by which a supplier can recover for goods or services that have been provided to the defendant and for which the defendant has not paid. *See Altacare Corp. v. Decker, Hallman, Barber & Briggs, P.C.*, 730 S.E.2d 12, 14 (Ga. Ct. App. 2012) (quoting *Five Star Steel Constr., Inc. v. Klockner Namasco Corp.*, 524 S.E.2d 783, 785 (Ga. Ct. App. 1999)). Such an action is only appropriate where there is a contract (either express or implied) between the parties and there are no disputes other than the defendant's nonpayment for the goods or services supplied by the plaintiff. *Scott v. Prestige Fin. Servs., Inc.*, 813 S.E.2d 610, 612 (Ga. Ct. App. 2018).

Plaintiff brought a similar open account claim against each Defendant. Plaintiff argues that Defendants' answers, which generally deny liability on the open account claims, should be stricken as insufficient under Ga. Code Ann. § 9-10-112. In the alternative, Plaintiff argues that there are no issues of material fact as to four of the six open account claims, and the only matter to be resolved on those four claims is

Defendants' nonpayment for the goods supplied to them. Defendants, on the other hand, argue that there are questions of fact regarding their receipt of the invoiced crop inputs and their agreement to the prices in the invoices.

### 1. Defendants' Compliance with Ga. Code Ann. § 9-10-112

First, Plaintiff argues that it is entitled to summary judgment on its open account claims against Jeanna, Daddy Rabbit, Rabbit Ridge, and Tripp (Counts II, X, XII, XVII) for Defendants' failures to comply with the pleading requirements of Ga. Code Ann. § 9-10-112, which states:

> Whenever an action is brought on an open account and the same is verified by the plaintiff as provided by law, the answer either shall deny that the defendant is indebted in any sum or shall specify the amount in which the defendant admits he may be indebted and it shall be verified as required by law.

Under Georgia law, answers that do not adhere to Ga. Code Ann. § 9-10-112 should be stricken, and the claimant is entitled to summary judgment on his open account claims. *Scott*, 813 S.E.2d at 612; *see also Nelson v. Mexicana de Jugos y Sabores*, 229 S.E.2d 102, 102 (Ga. Ct. App. 1976).

The District Court for the Northern District of Georgia recently considered whether this pleading standard is binding on parties to federal-court diversity cases and determined that it is not. *See Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 324 F. Supp. 3d 1269, 1282–83 (N.D. Ga. 2018). Under the Supreme Court's jurisprudence in *Hanna v. Plumer*, 380 U.S. 460 (1965), the federal courts are required to apply a Federal Rule of Civil

Procedure where it applies and may only disregard a Rule if it is found to be unconstitutional or if it would modify, enlarge, or abridge a substantive right under the Rules Enabling Act. *Meunier*, 324 F Supp. 3d at 1282 (citing *Hanna*, 380 U.S. at 471). With regard to responsive pleading, the Federal Rules require only that a responding party "(A) state in short and plain terms its defenses to each claim asserted against it; and (B) admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1). Denials, in particular, need only be specific enough as to "fairly respond to the substance of the allegation." *Id.* at (b)(2). Because Rule 8 governs responsive pleading standards and conflicts with the heightened pleading standards of Ga. Code Ann. § 9-10-112, Rule 8 controls in this case.

In their answers, Defendants deny each of Plaintiff's open account allegations. *See* [Doc. 52, ¶¶ 69, 70, 78, 79, 100, 102; Doc. 51, ¶¶ 31, 32, 69, 70]. These denials are sufficient to comply with the requirements of Rule 8, and Plaintiff's request that Defendants' answers be stricken for failing to comply with the state statute is denied.

2.  Open Account Claims Against the Everidge Entities

Having found that Defendants' answers meet the pleading standards for open account claims, the Court turns to whether open account is a proper method of recovery in this case. A plaintiff states a prima facie claim on open account by (1) attaching to its complaint an "invoice showing the goods shipped, the price, and the balance due," (2) tendering the authenticated invoice into evidence, and (3) presenting testimony that the

invoice remains unpaid. *Imex Int'l, Inc. v. Wires Eng'g, s.r.j.*, 583 S.E.2d 117, 120–21 (Ga. Ct. App. 2003) (citations omitted).

Once the plaintiff makes a prima facie showing of open account, the burden shifts the defendant to present "specific facts to refute the plaintiff's proof." *American Arbitration Ass'n v. Bowen*, 743 S.E.2d 612, 614 (Ga. Ct. App. 2013) (emphasis added) (citation omitted). To do so, the defendant must establish that there is a bona fide dispute as to the terms of the contract, his receipt of the goods, the amount of the invoice, the failure of consideration, or some other fact other than nonpayment. *Imex*, 583 S.E.2d at 121; *see also Altacare Corp.*, 730 S.E.2d at 14 (quoting *Five Star Steel*, 524 S.E.2d at 785) ("[W]hen there is a dispute that goes to either assent to the services, terms of the contract, what work was performed, the quality of the performance, or cost, then suit on account is not the proper procedure for suit, because there is a factual issue other than nonpayment on the account.").

There can be no question in this case that there was at least an implied contract between Plaintiff and the Everidge Entities since Defendants admit that Plaintiff provided crop inputs and Defendants accepted at least some of them. *See id.* at 120 ("An action for an open account on invoice is an action on implied contract where the seller fully performed on a unilateral contract by delivery of the goods and where the purchaser either expressly or impliedly promised to pay by acceptance of the goods shipped."). Further, Plaintiff presented invoices that have been tendered into evidence and

authenticated by Plaintiff's Director of Credit, Dee Dee Mears. [Doc. 69-4]. Mears also avers that the invoices remain outstanding. [*Id.* at ¶ 8].

Accordingly, the burden now shifts to Defendants to rebut the presumption that the invoices are correct and that they received the goods included on the invoices. First, Defendants argue that there can be no suit on open account because there is a question of fact as to which Entity received and used the goods listed in the invoices. They base this purported question of fact on the discrepancies between the names on the hand tickets and the names on the invoices, and on Plaintiff's "very unorthodox 'business practices.'" [Doc. 90, p. 7]. However, Defendants' deposition testimonies reveal that the confusion likely stemmed from their own business practices.

Although it is clear that there are two Everidge Entities in name, it does not appear that the distinction carries over to their everyday business practices. Jeanna testified that the Everidges themselves refer to the Entities collectively as "the farm," with no distinction between the two. [Doc. 86-1, Jeanna Sup. Ct. Depo., pp. 5:23—6:20]. The Everidges testified that Ron is solely responsible for ordering crop inputs for both of the Everidge Entities [Doc. 72, Jeanna Depo., p. 39:2–13; Doc. 75, Ron Depo., p. 26:4–14; Doc. 76, Tripp Depo., pp. 32:14–20, 77:7–13; Doc. 86-3, Jeanna Sup. Ct. Depo., pp. 7:14—8:7; Doc. 86-4, Ron Sup. Ct. Depo., p. 78:12–14]. All of the crop inputs the Everidge Entities received via delivery were sent to the same locations. [Doc. 74, Rabbit Ridge 30(b)(6) Depo., p. 86:3–7]. Daddy Rabbit employs no one; rather, it used Rabbit Ridge's employees

to complete whatever farm work needed to be done. [Doc. 86-4, Ron Sup. Ct. Depo., pp. 30:16–21, 78:22–25]. When the Everidges or their employees went to Plaintiff's store to pick up crop inputs, they did not keep track of which Entity's products were retrieved or who retrieved them. [Doc. 73, Daddy Rabbit 30(b)(6) Depo., pp. 140:11—141:17]. Indeed, Ron testified that Daddy Rabbit kept no records of any products he ordered or received from Plaintiff over the 13-year course of their business dealings. [Doc. 73, Daddy Rabbit 30(b)(6) Depo., pp. 65:4—66:25]. And when asked how the Everidges split up the crop inputs stored on their premises, Ron testified that they did not split up the products, that they kept no records of which products belonged to which Entity, and that one of the Entities may have used products belonging to the other or products charged to the Tripp Note. [Doc. 74, Rabbit Ridge 30(b)(6) Depo., pp. 85:22—88:6].

In essence, it appears that the Everidge Entities held themselves out to be a single operation in their dealings with Plaintiff, and they are now equitably estopped from seeking to hold Plaintiff accountable for failing to treat them as separate corporate entities when they ordered, retrieved, and received goods. Accordingly, there is no bona fide dispute as to the Entities' receipt of the goods listed in their invoices and Tripp's invoices because the record evidence unequivocally shows that they jointly received and used those goods.

Nevertheless, the Court finds that there is a bona fide dispute as to whether the Entities agreed to the price of the goods prior to Plaintiff's performance on the contract.

A suit on open account cannot lie where there is no previously agreed-upon price for the goods supplied. *See Zampatti v. Tradebank Int'l Franchising Corp.*, 508 S.E.2d 750, 760 (Ga. Ct. App. 1998) (quoting *Wolfe v. Brown-Wright Hotel Supply Corp.*, 73 S.E.2d 82, 84 (Ga. Ct. App. 1952)) ("A suit on an open account may be maintained for the price of goods sold under a contract where the price has been agreed upon by the seller and purchaser and where the seller has performed his part of the agreement and nothing remains to be done except for the purchaser to make payment . . . [But] [w]hen the value of the goods . . . was not agreed upon prior to performance and is in dispute at trial . . . then the action should be in quantum meruit.").

Ron, who was responsible for ordering all goods to be used by the Everidge Entities, testified that in previous years he met with Plaintiff's representatives at the end of the year to discuss any discrepancies, such as him being "[b]illed for items we didn't get, [and] overcharged for certain items." [Doc. 75, pp. 24:6—25:1]. In April of 2016, the year after the Everidges allegedly ordered and used the products at issue in this case, Ron met with several of Plaintiff's representatives to discuss the Everidges' overdue accounts from the prior year. [Doc. 74, pp. 92:15—93:4]. Ron recalled the meeting and testified that the parties never agreed to the amount that was owed and that he was not satisfied that all of the accounts were "verified." [*Id.* at pp. 94:2—97:11]. Considering the parties' course of dealing, it appears that agreements as to the per-unit and total prices of goods—some of which were custom made for the Everidges' farms, *see* [Doc. 74, pp. 51:11—52:4]—

generally occurred after Plaintiff's performance. And, in the year at issue in this case and based on Ron's testimony, the parties appear to have never reached an agreement on the per-unit prices listed in the invoices presently before the Court.

Accordingly, there remains a question of fact as to whether the parties ever agreed on the prices of the items listed in the invoices, and in the presence of such a dispute, there can be no claim for open account. Thus, the Court **DENIES** Plaintiff's motion for summary judgment on its open account claims against the Entities (Counts II, X, XVII) and **GRANTS** Daddy Rabbit's motion for summary judgment on the open account claims against it (Counts II, X).

### 3. Open Account Claims Against Jeanna

The parties cross-move for summary judgment on Count II for open account against Jeanna, and Jeanna moves for summary judgment on the other "open account" claim against her (Count XIX). Jeanna contends that it is undisputed that she (1) did not operate a farm in her personal capacity in 2015, (2) neither received nor used any products from Plaintiff in her personal capacity, and (3) did not receive any personal benefit from any of the invoiced products at issue in this case. [Doc. 77-1, pp. 3–4].

In response, Plaintiff first points to Jeanna's deposition testimony that she operated a farm in her individual capacity in 2015 as evidence that she received and used the goods attributed to Jeanna and Daddy Rabbit in Count II and attached to the Complaint as Exhibit G, *see* [Doc. 46-8]. Plaintiff also relies on Ron's deposition testimony

that he received all of the goods attributed to Jeanna in Count XIX and attached to the

Complaint as Exhibit N, *see* [Doc. 46-15].

*a.*     *Count II*

With regard to Count II, the Court agrees with Jeanna that she cannot be held liable

in her individual capacity on a theory of open account because there are questions of fact

as to whether she individually received and used the products Plaintiff supplied to the

Everidge Entities in 2015. Jeanna states in her affidavits that she did not farm individually

in 2015 and that she received no products for her individual benefit in 2015. *See* [Doc. 90-

2, ¶¶ 6, 18; Doc. 127-3, ¶¶ 9, 10, 11]. However, these statements appear to be contradicted

by her deposition testimony:

> Q: When you talk about, when we talk about the Daddy Rabbit Farms
> harvest, do you believe that Jeanna Everidge has any ownership of
> that harvest individually?
> A: Individually as did I sell cotton in Jeanna Everidge's name?
> Q: Yes.
> A: Yes.
> Q: What portion of the cotton is yours and what portion is the Daddy
> Rabbit Farms'?
> A: I don't know. I mean, not right here in front of me, I would have to
> look through some, go through some papers.
> [. . .]
> Q: And so if product was purchased from [Plaintiff] or from CFA or
> from anyone, for that matter, for all the [Daddy Rabbit] property,
> some of it would be due and owing by Jeanna Everidge individually,
> correct?
> A: I don't know. I don't know for sure.
> Q: Are you saying that Daddy Rabbit Farms pays for product to be used
> on Jeanna Everidge's property?
> A: Everyone pays for their own.
> Q: Which was what I was assuming.

19

A:    I don't know, when we sit down, we will figure that one out. I mean, that's done with our CPA.

[. . .]

Q:    Did you, Jeanna Everidge, receive any of those products . . . did you receive any of those products?

A:    I am not sure.

Q:    Did Jeanna Everidge, according to the [Farm Service Agency], farm land?

A:    For '16 or '15?

Q:    For '15.

A:    I am not sure about '15 . . . .

[Doc. 72, pp. 55:4—58:11].

In the absence of some explanation as to why Jeanna's deposition testimony (in which she is unsure of whether she farmed individually and whether she received products from Plaintiff in 2015) contradicts her affidavit (in which she unequivocally denies receiving products from Plaintiff in 2015 and farming in 2015) the Court disregards Jeanna's affidavit as a sham designed to create an issue of fact. *See Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984); *cf. Bruss v. King & Brim Ins.*, No. 1:11-CV-2632-MHS, 2012 WL 13012610, at *3 (N.D. Ga. Apr. 26, 2012) (deeming an affidavit a sham where "Plaintiff's unequivocal statement in her 'affidavit' contradicts, without explanation, her uncertainty on [the] issue in her deposition.").

But even in the absence of Jeanna's affidavit, the Court nonetheless finds that there is a question of fact as to how many of the goods connected to Count II of the Complaint were personally received and used by Jeanna individually. Although Jeanna may have individually farmed and received goods from Plaintiff in 2015, the invoices relating to

Count II are addressed solely to Daddy Rabbit. *See* [Doc. 46-8]. Additionally, while Ron testified that products invoiced to Daddy Rabbit, Rabbit Ridge, and Tripp could have been intermingled and used by the Entities, [Doc. 74, pp. 86:11—87:18], there is no evidence as to how much was delivered to or used by Jeanna individually. When there are questions of fact, such as this one, regarding the amount of goods received, a claim on open account is improper. Accordingly, on Count II, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Jeanna's.

> b. *Count XIX*

Jeanna characterizes Count XIX as one for unjust enrichment although it is styled as "J. Everidge Note/Open Account" because it charges Jeanna with accepting, using, and receiving the benefit of $246,240.18 worth of products and requests that the Court "find that it would be inequitable for [Jeanna] to wrongfully retain these benefits that have been conferred upon her, without paying the value thereof to Plaintiff." [Doc. 46, ¶¶ 109, 110].

If the Court construes Count XIX as one solely for open account, it fails for the same reasons as Count II does. Each of the invoices related to Count XIX is addressed to either Daddy Rabbit or Rabbit Ridge. The only evidence showing that Jeanna received goods from Plaintiff is her testimony that she might have farmed individually in 2015, might have owed some portion of the amount due to Plaintiff from Daddy Rabbit, and might have received goods billed to Daddy Rabbit. Plaintiff relies mainly on Ron's admission that he does not dispute that *someone* received all of the goods pertinent to

21

Count XIX, but there is no indication in Ron's deposition of who that someone was. Accordingly, there are questions of fact—whether and how much of the products invoiced in Exhibit N to the Complaint [Doc. 46-15] were received and used by Jeanna—that preclude Plaintiff's ability to proceed under a theory of open account on Count XIX. Jeanna's motion for summary judgment on that count must be granted.

If Count XIX also encompasses a claim for unjust enrichment, the same questions of fact that eliminate the open account theory prevent the Court from granting summary judgment to either party on a theory of unjust enrichment.

> [A] claim for unjust enrichment exists where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant; that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and that the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it.

*Campbell v. Ailion*, 790 S.E.2d 68, 73 (Ga. Ct. App. 2016) (citations omitted).

In this case, it is undisputed that Ron ordered crop inputs from Plaintiff on behalf of his family farming businesses, that Plaintiff expected to be paid for those crop inputs, and that someone accepted and used at least some of those goods. But although the Court has determined that the Entities received the goods invoiced to them, there remains a question of fact as to whether Jeanna used any of those goods. This question is one to be resolved for a jury, and Jeanna's motion for summary judgment on Count XIX's implied unjust enrichment claim is **DENIED**.

22

4.  Open Account Claims Against Tripp

As with Plaintiff's open account claims against the Entities and Jeanna, the Court finds that the open account claims against Tripp fail. Although Plaintiff's invoices constitute prima facie evidence that goods were delivered to Tripp, the Everidges testified that Tripp merely helped out at Rabbit Ridge rather than farming individually, had no role in purchasing goods for any of the Everidge farms, and did not individually receive any products from Plaintiff. [Doc. 75, Ron Depo., pp. 21:4–8, 26:6–14, 32:8–10; Doc. 76, Tripp Depo., pp. 32:14–20, 42:2–4, 43:18–21, 47:24—48:3, 60:19–20]. Thus, there is a question of fact as to Tripp's individual receipt and use of the goods outlined in the invoices addressed to him, and Plaintiff is not entitled to summary judgment on Count XII.

Because there are questions of fact other than Defendants' nonpayment on all of the open account claims raised in the parties' motions, Plaintiff's motion for summary judgment on the open account claims is **DENIED**, and Jeanna and Daddy Rabbit's motion for summary judgment on the open account claims alleged against them is **GRANTED**. Counts II, X, XII, and XVII are **DISMISSED**.[6] Jeanna's motion for summary judgment on

[6] There appears to be some confusion in the courts as to whether open account claims that contain questions of fact other than nonpayment should be dismissed or permitted to go to trial after a court's finding of genuine issues of material fact and its denial of a plaintiff's motion for summary judgment. *Compare Watson v. Sierra Contracting Corp.*, 485 S.E.2d 563, 570 (Ga. Ct. App. 1997) (reversing trial court's grant of summary judgment to plaintiff on open account claim "because there remain[] disputed issues of material fact under such theory of liability for jury determination") *with Valley Proteins, Inc. v. Hulsey Envtl. Servs., Inc.*, No. 2:13-cv-00093-WCO, 2014 WL 12480024 at *9 (N.D. Ga. Dec. 23, 2014) (granting summary judgment to defendant on open account claims after finding several issues of material fact and noting that "[w]hen there is a

the unjust enrichment claim against her is **DENIED**, and Count XIX will proceed to trial only on the theory of unjust enrichment.

### C. Plaintiff's Breach of Contract Claim Against Ron and Rabbit Ridge

#### 1. Liability

In addition to its open account claims, Plaintiff moves for summary judgment on its claims against Ron and Rabbit Ridge for breach of contract (Count VII) and attorney's fees (Count IX). Plaintiff's breach of contract claim seeks to collect on the Rabbit Ridge Note. For Plaintiff to state a prima facie case on a claim for the enforcement of a promissory note, it must produce the promissory note and show that it was executed. *Collins v. Regions Bank*, 639 S.E.2d 626, 627 (Ga. Ct. App. 2006) (quoting *Stewart v. Johnson*,

---

dispute about the character of the services performed, then an action on open account should not be allowed to proceed"). *See also Altacare Corp.*, 730 S.E.2d at 14 (quoting *Five Star Steel*, 524 S.E.2d at 785) ("[W]hen there is a dispute that goes to either assent to the services, terms of the contract, what work was performed, the quality of the performance, or cost, then suit on account is not the proper procedure for suit, because there is a factual issue other than nonpayment on the account."); *Schluter v. Perrie, Buker, Stagg & Jones, P.C.*, 498 S.E.2d 543, 545 (Ga. Ct. App. 1998) (physical precedent only) (in action for recovery of unpaid legal fees, the defendant's challenge of the validity of the hours billed "takes the case outside the simplified parameters of an action on open account[, such that] [t]he firm's claim must proceed as a breach of contract action"); *American Teleconferencing Servs., Ltd. v. Network Billing Sys., LLC*, 668 S.E.2d 259, 263 (Ga. Ct. App. 2008) (finding that the trial court erred in denying defendant's motion for summary judgment on open account claim where the defendant challenged the content of the plaintiff's invoices and raised genuine issues of material fact).

Because several of these courts granted summary judgment to the defendant on open account claims when there were issues of material fact and, in essence, determined that the claims were not meant for jury adjudication, and because open account claims are merely methods for bringing simplified breach of contract claims rather than substantive claims in their own right, the Court finds it appropriate to dismiss Plaintiff's open account claims even where Defendants have not themselves moved for summary judgment on them. The factual complications of this case take it outside the purview of a simplified method of recovery such as open account, and Plaintiff's claims are therefore more properly addressed via claims for breach of contract, quantum meruit, and/or unjust enrichment.

605 S.E.2d 111, 113 (Ga Ct. App. 2004)). A defendant admits the validity of a note if he fails to specifically deny the validity in his answer. Ga. Code Ann. § 11-3-308(a).[7] Once the plaintiff states a prima facie claim for the enforcement of a promissory note, the burden shifts to the defendant to establish a defense to the note. *Id.* at (b). If the defendant fails to prove a defense, the plaintiff is entitled to summary judgment. *Producers Credit Corp. v. C2 Farms, Inc.*, No. 5:16-CV-320 (MTT), 2017 WL 393611, at *1 (M.D. Ga. Jan. 27, 2017).

Plaintiff attached a copy of the Rabbit Ridge Note to its Complaint and authenticated it through the affidavit of Dee Dee Mears, its Director of Credit. [Doc. 46-4; Doc. 69-4, ¶ 3(d)]. The Rabbit Ridge Note names Rabbit Ridge and Ron as borrowers and required them to pay the $250,000.00 of principal and any additional accrued interest on the Note prior to the February 15, 2016 maturity date. [Doc. 46-4, pp. 1, 4]. Ron signed the Note in his individual capacity and as president of Rabbit Ridge. [*Id.* at p. 6]. Ron and Rabbit Ridge did not specifically deny the validity of the Note in their Answer—they merely demanded "strict proof" that the Note is what it is purported to be and that they be provided with true and correct copies of the Note before responding to Plaintiff's Complaint. [Doc. 52, ¶ 11(b)]. Mears provided "strict proof" of the validity of the Note in

---

[7] To the extent this standard requires a denial more specific than that required by Federal Rule of Civil Procedure 8(b), the Court substitutes the pleading requirements of Rule 8(b). *See* Section B(1), *supra*; *Hanna*, 380 U.S. at 471. The remainder of the statute, which governs the standard of proof for authenticity of negotiable instruments, is substantive and therefore binding upon the parties in this case. *See Hanna*, 380 U.S. at 465.

her affidavit. *Cf. Producers Credit*, 2017 WL 393611, at *2 n.3. Ron and Rabbit Ridge, having otherwise failed to specifically deny the validity of their signatures on the Note, have admitted that the Note was executed.

Ron and Rabbit Ridge defend against Plaintiff's claim by arguing that there was a failure of consideration because "a question of fact remains as to the product actually received by each defendant." [Doc. 89, pp. 6–7]. The Court found in Section B(2), *supra*, that the Everidge Entities are equitably estopped from distinguishing between themselves in this litigation because they held themselves out to be a single enterprise in their dealings with Plaintiff. To the extent Plaintiff has proven that the Entities ordered, received, and/or used products provided to them, they are jointly and severally liable for the value of those goods. Given Ron's testimony that he keeps no record of what products were received and that he is incapable of disputing receipt of the products, there is no genuine issue of material fact as to the Entities' receipt of the goods charged to them. Accordingly, Ron and Rabbit Ridge have failed to prove a defense to Plaintiff's breach of contract claim against them, and they are liable under the terms of the Rabbit Ridge Note.[8]

---

[8] Plaintiff brought an open account claim against Ron and Rabbit Ridge to recover the value of the goods charged to the Rabbit Ridge Note. [Doc. 46, Count VIII]. An open account claim is intended to be a simplified method by which a supplier of goods or services can recover for breach of contract. *See Schluter*, *supra* note 6. Because the Court finds Ron and Rabbit Ridge to be liable under the terms of the Note, Plaintiff's claim on open account is **DISMISSED as moot**.

2. <u>Damages</u>

A plaintiff asserting a breach of contract claim bears the burden of proving damages and must provide the jury with "sufficient data to estimate the damages with reasonable certainty." *Lay Bros. v. Golden Pantry Food Stores, Inc.*, 616 S.E.2d 160, 165 (Ga. Ct. App. 2005) (quoting *Walton v. Datry*, 363 S.E.2d 295, 300–01 (Ga. Ct. App. 1987)). Moreover, the plaintiff is not entitled to damages that are not "capable of exact computation." *Id.* (quoting *Bauer v. North Fulton Med. Ctr., Inc.*, 527 S.E.2d 240, 244 (Ga. Ct. App. 1999)).

Under the terms of the Rabbit Ridge Note, Plaintiff is entitled to $250,000.00 of principal. However, the Court cannot award interest to Plaintiff at this time because the interest rate on the Note has not been sufficiently proven. The Note does not include a stated interest rate; instead, it defines the interest rate as "CFA Base Rate Plus 2.00%" for interest incurred up to the maturity date and "the lesser of CFA Base Rate plus 7.50% or the maximum rate permitted by law" for interest incurred from the maturity date up to the payment date. [Doc. 46-4, p. 4]. The "CFA Base Rate" is defined as "the interest rate which The Cooperative Finance Association, Inc. publishes from time to time as the prevalent interest rate for corporate borrowers and entitled the [']CFA Base Rate['] in such publications." [*Id.* at p. 1]. Throughout its briefs and filings, Plaintiff merely states total interest due and per diem interest as dollar amounts—$57,219.45 and $78.125, respectively—but does not prove how the dollar amounts were reached or provide

evidence of the "CFA Base Rate." *See, e.g.*, [Doc. 46, ¶ 19(b); Doc. 69-4, ¶ 13]. In the absence of such proof, the Court cannot award the interest amount as alleged. Thus, Plaintiff's motion for summary judgment on Count VII of the Complaint is **GRANTED IN PART**, and Plaintiff is entitled to recover principal in the amount of $250,000.00.[9]

### 3.    Attorney's Fees

If a plaintiff is entitled to recover on the promissory note, she may also be entitled to recover attorney's fees under Ga. Code Ann. § 13-1-11. To do so, the plaintiff must, upon the maturity of the note, notify the defendant of her intent to seek attorney's fees under the statute and notify the defendant that he has ten days to pay the full amount of the debt including interest in order to avoid liability for the plaintiff's attorney's fees. Ga. Code Ann. § 13-1-11(a)(3); *see also Core LaVista, LLC v. Cumming*, 709 S.E.2d 336, 343 (Ga. Ct. App. 2011). If this has been done, the plaintiff is entitled to recover reasonable attorney's fees as specified in the note or in the amount of 15% of the first $500.00 of the total indebtedness owed (i.e., principal and accrued interest), and 10% of the remaining total indebtedness. Ga. Code Ann. § 13-1-11(a)(1), (2).

Plaintiff alleges in its Complaint that CFA notified each Defendant in writing of its intent to seek attorney's fees under Section 13-1-11 and informed them of their right to avoid attorney's fees by paying the full amount of the debt within ten days. [Doc. 46, ¶

---

[9] Plaintiff may file a renewed motion for summary judgment on this particular count as to its entitlement to accrued interest once it obtains proof of the CFA Base Rate and submits it to the Court for review. *See* Fed. R. Civ. P. 56(e)(1).

18]. Although copies of these notices were not tendered into evidence, the Court may still award attorney's fees under the statute since Ron and Rabbit Ridge admitted to receiving proper notice in their Answer. [Doc. 52, ¶ 18]; *see Newby v. Armour Agric. Chem. Co.*, 168 S.E.2d 652, 653 (Ga. Ct. App. 1969).[10]

Having found that Plaintiff complied with Section 13-1-11, the Court **GRANTS** Plaintiff's motion for summary judgment as to Count IX. Plaintiff is entitled to attorney's fees in the amount of 15% of the first $500 of Ron and Rabbit Ridge's indebtedness and 10% of the remaining indebtedness, for a total of $25,025.00.[11]

### D.      Plaintiff's Breach of Contract Claim on the Daddy Rabbit Note

Jeanna and Daddy Rabbit move for summary judgment on Plaintiff's claims relating to the Daddy Rabbit Note. [Doc. 46, Counts I, V, VI]. Plaintiff advances three alternative theories of recovery on the Note. First, Plaintiff alleges that Jeanna executed the Note herself in her individual capacity and on behalf of Daddy Rabbit and therefore

---

[10] Plaintiff attached two letters to its Complaint regarding the Rabbit Ridge Note and cited to them as evidence of compliance with Section 13-1-11. [Doc. 46-12; Doc. 69-1, p. 5]. These letters do not inform Ron and Rabbit Ridge of their ability to avoid the payment of attorney's fees by paying their debt in full within ten days and therefore do not comply with the requirements of Section 13-1-11. The Court need not consider them, however, given Defendants' admission to receiving notices that complied with the statute and that were apparently different than the ones attached to the Complaint.

[11] The Note does not provide for attorney's fees in a specified amount, and Plaintiff is therefore entitled to attorney's fees as calculated under Section 13-1-11(a)(2). Given the Court's inability to calculate interest owed on the Rabbit Ridge Note, the amount of attorney's fees due to Plaintiff is 15% of the first $500.00 of unpaid principal ($250,000.00) plus 10% of the remaining $249,500.00. Should Plaintiff file a renewed motion for summary judgment containing evidence of the CFA Base Rate, it may request that the Court amend the attorney's fees award to reflect the updated indebtedness amount. Moreover, because the attorney's fees award will be in excess of $20,000, the Court will entertain a timely motion from Defendants regarding the reasonableness of such award. *See* Ga. Code Ann. § 13-1-11(b).

bound them to the terms of the Note. [*Id.* at Count I]. However, if Jeanna did not sign the Note herself, Plaintiff alleges that Ron signed it with Jeanna and Daddy Rabbit's apparent authority. [*Id.* at Count V]. Finally, Plaintiff alleges that, even if neither Jeanna nor Ron signed the Note, or if Ron did not sign the Note with Daddy Rabbit and Jeanna's authority, Jeanna and Daddy Rabbit ratified the Note by accepting and using crop inputs paid for with proceeds from the Note. [*Id.* at Count VI].

### 1. Count I: Default on the Daddy Rabbit Note

As previously explained, a plaintiff states a prima facie case for recovery on a promissory note by producing the note and showing that it was executed. *Collins*, 639 S.E.2d at 627 (quoting *Stewart*, 605 S.E.2d at 113). If the defendant denies the validity of the note in his answer, the burden is on the plaintiff to establish that the note is authentic and that the maker of the note had authority to sign it. Ga. Code Ann. § 11-3-308(a). But even when the defendant denies the note's validity in his answer, the note is presumed to be valid unless the maker is dead or incompetent at the time of trial. *Id.* To conclusively divest the plaintiff of her entitlement to judgment as a matter of law, the defendant must assert and prove an affirmative defense. *Id.* at (b); *Collins*, 639 S.E.2d at 627 (quoting *Stewart*, 605 S.E.2d at 113). When the defendant moves for summary judgment on the basis of such a defense, he must show that there is no genuine issue of material fact on any of the elements of the defense. *International Stamp Art, Inc. v. United States Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (per curiam) (citation omitted).

Plaintiff attached a copy of the signed Daddy Rabbit Note to its Complaint. [Doc. 46-2]. The Note, having been produced by Plaintiff and executed, establishes a prima facie claim for recovery under its terms. Jeanna and Daddy Rabbit deny the validity of the Note in their Answer, [Doc. 51, ¶ 11], and raise the defenses of forgery, unenforceability, and accord and satisfaction. [*Id.* at p. 2]. Jeanna and Daddy Rabbit argue that the Note is unenforceable because there is no evidence that Jeanna signed the Note. In her affidavit, Jeanna states, "I did not execute the documents referenced in Plaintiff's Amended Complaint as the '[Daddy Rabbit] Note[,]' and the signatures thereon[] purporting to be mine are unauthorized and forged." [Doc. 77-3, ¶ 4]. Jeanna also testified in her deposition that she did not sign the Note. [Doc. 72, Jeanna Depo., pp. 26:22—27:3]. Although Jeanna's affidavit and deposition testimony are sufficient to create an issue of material fact on Plaintiff's breach of contract claim, *see Lee v. SunTrust Bank*, 722 S.E.2d 884, 885 (Ga. Ct. App. 2012), Defendants must "produce[] other evidence separate from the sworn denial of execution" to succeed on their motion for summary judgment, *Southtrust Bank of Ga. v. Parker*, 486 S.E.2d 402, 405 (Ga. Ct. App. 1997). It is only upon Defendants' introduction of such "other evidence" that the burden shifts back to Plaintiff to put forth affirmative evidence of its own. *Id.*

Despite this burden-shifting scheme, Plaintiff has presented evidence of its own accord via its proffered handwriting expert Dianne Peterson, who opines that Jeanna did not sign the Daddy Rabbit and Jeanna Notes but that "it is probable" that Ron "may have"

signed the Notes. [Doc. 85-1, p. 28]. Jeanna and Daddy Rabbit seek to exclude Ms. Peterson's opinions because, they argue, she is not a qualified handwriting expert and her methodology is unreliable. *See generally* [Doc. 78].

a. *Defendants' Motion to Strike Testimony of Dianne Peterson*

Under Federal Rule of Evidence 702, the Court serves as the gatekeeper "to keep out irrelevant or unreliable expert testimony." *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (first citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999); then citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). In evaluating the admissibility of expert testimony under Rule 702, the Court must consider whether "(1) the expert is qualified to testify competently regarding the matters [she] intends to address; (2) the methodology by which the expert reaches [her] conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Proponents may establish an expert's qualification in various ways, including scientific training, education, or experience in a particular field, *id.* at 1260–61, but there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field. *Santos v. Posadas De P.R. Assocs., Inc.*, 452 F.3d 59, 63 (1st Cir. 2006). When assessing the reliability of the methodology the expert employs, the Court considers the methodology's (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance. *Daubert*, 509 U.S. at 593–95.

As to her qualifications, Ms. Peterson avers that, after taking 144 classes, she graduated from the International School of Forensic Document Examination ("ISFDE"), which provides online courses, examinations, and mentorship in handwriting analysis. [Doc. 85-1, pp. 1–2, 8–10]. She also completed an apprenticeship on over 60 cases with Bart Baggett, who she claims is a qualified handwriting expert. [*Id.* at p. 2, ¶ 4]. In addition to graduating from ISFDE, Ms. Peterson has completed training through Forensic Document Examiners, an organization that offers peer-reviewed case analyses and scientific literature review assignments. [*Id.* at p. 3, ¶ 11]. In 2017, she became certified as a forensic document examiner by the Scientific Association of Forensic Examiners ("SAFE"), for whom she has been the treasurer since 2014. [*Id.* at pp. 4, 19]. Since 2009, she has examined over 500 cases and has testified in 19 state-court proceedings. [*Id.* at pp. 2, 14–16]. And, finally, Ms. Peterson published an article entitled "How to Submit Evidence for a Questioned Signature Case" in the Journal of Forensic Research in 2018. [*Id.* at p. 17].

Defendants challenge these qualifications as insufficient given Ms. Peterson's lack of board certification from the American Board of Forensic Document Examiners ("ABFDE"), which they and several courts (including this one) recognize as the preeminent accreditation body and gold standard for expertise in the document

examination field.[12] Although Ms. Peterson's lack of board certification weighs heavily

against her, Plaintiff argues that Ms. Peterson's extensive hands-on experience and

education (although untraditional)[13] more than make up for it. The Court agrees.

Ms. Peterson's situation is similar to that of Wendy Carlson, a handwriting expert

whose testimony was admitted in *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles,*

*Inc.*, No. 13-cv-3206-WJM-KMT, 2016 WL 8608447 (D. Colo. Sept. 12, 2016). Like Ms.

Peterson, Ms. Carlson was trained at ISFDE, which is owned and run by Bart Baggett in

possible association with his father Curtis Baggett. *Porcelanosa*, 2016 WL 8608447, at *2;

[Doc. 85-1, p. 2, ¶¶ 4, 7]. Moreover, the plaintiff in *Porcelanosa* attacked the Baggetts'

credibility in an attempt to cast a pall on Ms. Carlson's qualifications, which Defendants

in this case seek to do to Ms. Peterson. 2016 WL 8608447, at *2 (describing Bart Baggett as

a "'media figure' and author of self-help books" and Curtis Baggett as a "charlatan" that

had been disqualified as a handwriting expert in other cases). But this Court reaches the

---

[12] *See, e.g.*, *Dracz v. American Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1378 n.16 (M.D. Ga. 2006); *Chavez v. Mercantil Commercebank, N.A.*, No. 10-23244-CIV, 2014 WL 2158417, at *5–7 (S.D. Fla. May 23, 2014) (finding both parties' experts to be qualified where they, among other things, received or were in the process of receiving ABFDE certification), *rev'd in part on other grounds by* 601 F. App'x 814 (11th Cir. 2015) (per curiam); *United States v. Dale*, 618 F. App'x 494, 497 (11th Cir. 2015) (finding that the trial court did not err in admitting testimony of handwriting analysis expert who was certified by the ABFDE); *American Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1313 (N.D. Ga. 2008) (disqualifying defendant's expert and finding it "significant" that he had not been certified by the ABFDE); *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1342 (N.D. Ga. 2003) (noting that, as of the date of that order, ABFDE was "[t]he only recognized organization for accrediting forensic document examiners").

[13] Defendants make much of the fact that Ms. Peterson obtained her education online, but they offer no evidence or convincing argument as to why in-person classes would somehow make her qualified as opposed to distance learning.

same conclusion as the *Porcelanosa* court: "[The] attacks on the Baggetts are generally *ad hominem* and unhelpful to the Court's analysis. The issue here is Ms. [Peterson's] qualifications, not the Baggetts'" and Defendants' "arguments do not point to actual problems with the methods she learned at [ISFDE]." *Id.* at *3. Ms. Peterson's training and experience, which include over 500 case studies, an apprenticeship reviewing over 60 peer-reviewed cases, and 19 expert appearances in real court cases, are sufficient to qualify her as an expert in this case, despite her lack of board certification. *Cf. Forsberg v. Pefanis*, 261 F.R.D. 694, 696, 701 n.1 (N.D. Ga. 2009) (admitting the testimony of an expert in forensic document examination who had no undergraduate degree, studied for two years through a distance learning program, trained with mentors for a five-year period, testified in court three times, and gave one deposition in her career, because, despite her lack of formal education, the expert "had an understanding of the process beyond that which a lay person would"). Any criticisms Defendants have of Ms. Peterson's expertise are more suited to cross-examination at trial, where the finder of fact may weigh her credibility compared to Defendants' arguably more-qualified document examiner. *See Porcelanosa*, 2016 WL 8608447, at *3.

Although the Court finds Ms. Peterson to be a qualified document examiner, it must exclude her expert report and conclusions, as they are not based on any methodology that is readily apparent from the record. Ms. Peterson conclusorily avers that she "conducted [her] analysis in this matter in accordance with the accepted

methodology in the handwriting scientific community." [Doc. 85-1, p. 3, ¶ 10]. In her expert report, Ms. Peterson explains that she examined and compared 81 documents "using magnification" and evaluated the "line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors, method of construction, and pattern formation" of the signatures on those documents. [*Id.* at pp. 23, 27, 28]. However, none of these terms are defined or specifically applied in the report to show what exactly Ms. Peterson did while evaluating the signatures. Instead, the report merely offers several pages of signature samples with arrows and circles highlighting a particular part of each signature and noting the differences between them, but there is no explanation for why Ms. Peterson chose those parts of the signature to highlight as opposed to others. Thus, the report does not present a reliable method by which Ms. Peterson reached her conclusion that Jeanna did not sign the Daddy Rabbit and Jeanna Notes but Ron "may have."[14] [*Id.* at p. 28]. Defendants' Motion to Strike [Doc. 78] is therefore **GRANTED**.

---

[14] *Cf. Ward*, 530 F. Supp. 2d at 1314 (finding proffered handwriting expert's report to be unreliable where he conclusorily stated that his opinions were the "product of reliable law enforcement principles," did not state "whether his observations ha[d] been empirically tested or whether his handwriting comparisons ha[d] an acceptable known or potential error rate," and did not indicate whether his methodology was published, peer reviewed, or generally accepted in the forensic document analysis field); *Dracz*, 426 F. Supp. 2d at 1380 (finding report to be unreliable where it failed to include "any detailed explanation as to exactly *how* [he] evaluated the documents and drew his conclusions regarding authorship and sequence") (emphasis supplied).

*b.*     *Jeanna and Daddy Rabbit's Motion for Summary Judgment*

Notwithstanding the Court's exclusion of Plaintiff's expert evidence as to the authenticity of the signature on the Daddy Rabbit Note, any lack of evidence on Plaintiff's part is irrelevant if Defendants cannot come forth with evidence of their own to support their forgery defense. *See Southtrust Bank*, 486 S.E.2d at 405. The only "evidence" Defendants rely on is Ms. Peterson's finding that Jeanna did not sign the Daddy Rabbit and Jeanna Notes, with which Defendants' handwriting expert, Steven Drexler, agrees. [Doc. 61-1, ¶ 8]. But Mr. Drexler's findings appear to be based on Plaintiff's expert's research and report, both of which the Court has excluded for Ms. Peterson's lack of reliable methodology. Mr. Drexler's affidavit, which is not based on his own research, experiments, or other admissible evidence, is insufficient to entitle Jeanna and Daddy Rabbit to summary judgment. Therefore, Jeanna and Daddy Rabbit are relegated to Jeanna's affidavit and testimony, which create no more than a question of fact as to who signed the Daddy Rabbit Note. Thus, Jeanna and Daddy Rabbit's motion for summary judgment on Count I is **DENIED**.

2.     Count V: Apparent Authority

In Count V of its Complaint, Plaintiff alleges that Ron signed the Daddy Rabbit Note with Jeanna and Daddy Rabbit's apparent authority, thereby binding them to the Note's terms. Because there remains a question of fact as to who signed the Note, as

explained in Section D(1) above, this count is not subject to summary adjudication, and Jeanna and Daddy Rabbit's motion for summary judgment on this claim is **DENIED**.

### 3. Count VI: Ratification

In the second alternative, Plaintiff alleges in Count VI of its Complaint that, even if Ron signed the Daddy Rabbit Note without authorization, Jeanna and Daddy Rabbit are liable for the Note because they ratified it by accepting goods purchased with the proceeds. Under Georgia law, a principal may be bound by a contract executed by one of its agents, even if the agent did not have the authority to bind the principal, if the principal ratifies the agent's acts. *Division Six Sports, Inc. v. Hire Dynamics, LLC*, ___ S.E.2d ___, 2019 WL 124350, at *3 (Ga. Ct. App. Jan. 8, 2019). Ratification occurs where the principal has "full knowledge of all the material facts" and "accepts the benefits of the unauthorized act or retains such benefits after discovering the material facts." *Brock v. Yale Mortg. Corp.*, 700 S.E.2d 583, 588–89 (Ga. 2010) (citations omitted). But where the principal has no knowledge of the agent's acts at the time they are made or at the time of accepting and retaining the benefits, it cannot be held liable for breach of contract under a ratification theory. *See Division Six*, 2019 WL 124350, at *3 (citation omitted) ("Ratification . . . binds the principal only if the principal knows of the agent's unauthorized act."); *see also Southtrust*, 486 S.E.2d at 405–06. "The burden of proving ratification is on the party asserting it, and whether a ratification occurred is generally a question of fact for a jury." *Id.* (citations omitted). However, if there is no evidence in the

record to establish that the principal had knowledge of the agent's acts, the Court may determine there was no ratification as a matter of law. *See Holy Fellowship Church of God in Christ v. Brittain*, 523 S.E.2d 93, 95 (Ga. Ct. App. 1999) (affirming trial court's grant of summary judgment to the defendants on ratification claim where there was no evidence that they knew about the unauthorized agreement).

Jeanna and Daddy Rabbit argue that they are entitled to summary judgment on Plaintiff's ratification claim because there is no evidence that they knew of the arguably unauthorized signature on the Daddy Rabbit Note. Because the jury may find that Jeanna signed the Note herself or that Ron signed the Note with Daddy Rabbit and/or Jeanna's apparent authority, this claim is also not entitled to summary adjudication, and Jeanna and Daddy Rabbit's motion for summary judgment on Count VI is **DENIED**.

E.      **Plaintiff's Breach of Contract Claim on the Jeanna Note**

Plaintiff advances the same three theories of recovery against Jeanna on the Jeanna Note as it did against Jeanna and Daddy Rabbit on the Daddy Rabbit Note. [Doc. 46, Counts XVIII, XXI, XXII]. As with Count I (default on the Daddy Rabbit Note), Count V (Ron's apparent authority to sign the Daddy Rabbit Note), and Count VI (ratification liability on the Daddy Rabbit Note), there are questions of fact that preclude summary judgment in favor of Jeanna on Counts XVIII (default on the Jeanna Note), XXI (Ron's apparent authority to sign the Jeanna Note), and XXII (ratification liability on the Jeanna Note). As to all of these claims, Jeanna argues that she did not sign the Note and that Ron

either did not sign the Note or had no authority to sign the Note. Each of these arguments raises a question of fact for a jury to decide; therefore, Jeanna's motion for summary judgment on Counts XVIII, XXI, and XXII is **DENIED**.[15]

### F.    Count III: Attorney's Fees

Jeanna and Daddy Rabbit also move for summary judgment on Plaintiff's claim for attorney's fees (Count III), which is derivative of Plaintiff's breach of contract (Count I) and open account claims (Count II) against these Defendants. *See D.G. Jenkins Homes, Inc. v. Wood*, 582 S.E.2d 478, 482 (Ga. Ct. App. 2003) ("The derivative claims of attorney fees and punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim."). As the Court has not granted complete summary judgment to Jeanna and Daddy Rabbit on Count I, their motion for summary judgment on Count III is **DENIED**.

### CONCLUSION

For the reasons stated above, the parties' Cross-Motions for Partial Summary Judgment [Docs. 69, 77] are both **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Strike [Doc. 78] is **GRANTED**. Plaintiff's Motion for Partial Summary Judgment [Doc. 69] is **GRANTED IN PART** as to Count VII and **GRANTED** as to Count IX, such that Plaintiff is entitled to damages in the amount of $250,000.00 plus

---

[15] At various points throughout her briefs, Jeanna indicates that the claims against her relating to the Jeanna Note are barred by res judicata. Because she does not fully elaborate on how res judicata bars the claims against her, the Court will not address such a defense in this Order.

attorney's fees in the amount of $25,025.00 to be paid upon the entry of judgment. Jeanna and Daddy Rabbit's Motion for Partial Summary Judgment [Doc. 77] is **GRANTED** as to Counts II and X. The Court **DISMISSES** Counts II, VIII, X, XII, and XVII. The remaining claims to be tried during the Court's April 2019 trial term are: Counts I, III, IV, V, VI, XI, XIII, XIV, XV, XVI, XVIII, XIX (on a claim for unjust enrichment only), XX, XXI, and XXII.

    **SO ORDERED**, this 30th day of January, 2019.

**s/Tilman E. Self, III**
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**
